Mr. Brodsky, if you're ready, you may proceed. I'm pleased to court Joel Brodsky on behalf of myself. In this particular case, after the proceeding on December 5th, the motion was heard, my motion to dissolve the egg order of April 4th was heard. I was reminded of, when I thought about it, I was reminded of the quote from Pompey Magnus, the Roman general. Could you speak up, Mr. Brodsky? We've got some type of air conditioning system that's background noise. I'm sorry. No, I'm fine. I was reminded of the quote by Pompey the Great, who said, don't quote law to men with swords. That's what I felt like I was doing. I think that it was after 37 years of being in the trenches, it was probably the most Kafkaesque experience I had had. I don't know if you recall the Kafkaesque story, the trial, where a man is accused, tried, later executed for a crime that nobody can tell him what the crime was, nor can tell him why he was charged or what he supposedly had done wrong. Yet he's put on a public trial, charged, put on a public trial, and then executed, not even his lawyer could tell him. And when I was looking at an egg order that all of a sudden didn't exist, it was an experience that was, I think, quite unique. Don't quote law to men with swords. But in this case, the issue is not only what is, I don't think it's an issue, but the issue raised by the state is what is the April 4th order that's in the transcripts and in the minutes? Does it make any difference if it's, of course, you label it a gag order, if you label it a condition of release. And in criminal contempt, why are we even dealing with conditions of release since criminal contempt is not a crime, it's not an offense, it's not statutory or otherwise. It is a sui generis proceeding, and there has never been a person held because a petition is such a petition for contempt, indirect criminal contempt has been filed. I think that it's being handled like one because it's been assigned in the criminal courtroom, and the plaintiff is represented, or the petition is represented by a prosecutor, and I guess when you're a carpenter, everything looks like a nail. But it's not. Well, you can be jailed for indirect criminal contempt. Yes, Judge, but it's not a crime. The reason they call it criminal contempt. Well, that's fair, but you can be jailed for it. Yes, and that's why certain process rights apply. Yet, what Betts and the case law says is that statutory provisions are only applicable to contempt charges, criminal or otherwise, if the statute specifically makes itself applicable. And if the statute doesn't make itself specifically applicable, then it's not applicable. And if you look at the release, what used to be called the bail bond statute and now is called conditions of release statute, whatever, there's nothing in there that makes it applicable to criminal contempt or any contempt proceedings at all, period. You can be jailed for civil contempt, by the way. Sure. Yeah, yeah. So, you know, and that's, therein lies, I guess, the problem, because this shouldn't be conditions of release in the first place. But I, when you look at the, and I cite, and I go through painstaking detail in my brief, I think, the transcripts and the minute orders that are entered, and there's no doubt when you look at all those, leading, the ones preceding April 4th and on April 4th, that the court was not concerned with conditions of release. It was concerned with that I don't talk about anything to anybody. It was a complete ban. What they call an all-mention gag order. And all-mention gag orders are unconstitutional, period, end of story, as our Supreme Court says in Kramer v. Maytank. I think it's, when is it not Maytank? Yeah, Maytank, I think it is Maytank. Anyway, the Kramer case. That says that any order that says you can't talk about anything about a case is, on its face, unconstitutional. That not only are, that a gag order has to be very specific and narrowly grafted to the circumstances necessary and cannot, and must be supported by a record that supports that. Now, this gag order is also problematic because every time I would complain about it, or it came up, I would be told that, be careful. We're doing this for your own good. We want, don't get in trouble. If you don't say anything, you can't violate it. There can be no question that the intent of the order is to chill my talking about the contempt case and about anything else that involves Peterson, period, incomplete, another, complete ban. There is no evidence or record to support this. It's all gone on speculation. There is nothing, I know the state says that what is in the record is what I have alleged to have said in the Ashley Banfield podcast, and even the state admits on page 13 of their brief that nothing in the Ashley Banfield podcast violates the attorney-client privilege. So why am I being charged, if that's the case, why am I being charged with contempt, with criminal contempt? Why, you know, they talk about went up to the line, but didn't cross it, didn't cross it, didn't violate it. If it's the line, then it can't be, then it's fake. If you say you can go up to the line, you're going to contempt, it's a matter for, as the trial judge seemed to think, it's a matter for the jury to work out. Well, then you can't charge them with contempt because, as the cases say, it has to be a clear prohibition. It can't be vague. You can't guess, well, am I violating the order or am I not violating it? We're not here to discuss the merits of the underlying contempt case, right? Well, to some extent, though, when you read the transcript of December 5th, I think to some extent we are because they're kind of intermixed. Because at the same time this happened, the next pre-proceeding motion was a motion for a bill of particulars asking for the state to tell me, okay, what did I say that violated the order and how did it violate it? And that was denied. Look at the transcript, I'm told, which isn't even a transcript. This is the record, and I cite to it in the record. Listen to the podcast, which is 20 minutes, and I'm supposed to pick out of that what they think I'm going to be charged with or what something in there violated it. Now, I know that the problem here is that I suppose the state's saying, you know, you're not talking well about your former client. And that may hurt him in the public eye, which I don't know if it's possible to do that, but supposing it is. Remember, I'm not his lawyer, and he's convicted of two separate, a murder and a solicitation for murder, have been found to have done a murder by a preponderance of the evidence, a second murder. And I'm not bound to be a cheerleader for him. As long as I don't violate the privilege and say what he told me, I can have a bad opinion of him. There's lawyers, a lot of lawyers. Doesn't the ethical rule preclude you from speaking to Mr. Brzezinski's character? To Peterson's character. Sorry, I apologize. You can talk about your own character. Mr. Peterson's character? Yes, but judge, if you look at that rule, I think you're talking about 3.6, that's pretrial. That rule binds a client, an attorney pretrial. Why are you representing the client in a trial? There's a different set of rules. I don't even know if there are a set of rules. I don't know if there are a set of rules where I can't do anything that prejudices him. I suppose I'd take a client, a position adverse to him in another proceeding post-trial, but it certainly doesn't say that you have to be a cheerleader. For example, a much bigger case, but in the O.J. Simpson case, famously, his lawyers in that case came out after the trial and after his acquittal and said things that did not bode well for their opinion of Mr. Simpson's character and innocence. Yet, nobody accused them. A lawyer, he doesn't have to be a cheerleader. If you say, you know, if I don't like him, if somebody asks me, do you like him? Do you think he's, or I just, you know, there's certain limitations. You have to draw lines, and the limitation is I can't talk about what he told me. I can't say anything attorney-client privilege. I don't have to get up and say, yeah, what a great guy. He didn't get a, I didn't think he got a square deal. I can say when he says something, I can't comment on his petition, which is what I did. He filed a petition that says that I wouldn't let him testify. Well, there's only one reason in a criminal case. That's the law. I don't, anybody can say that. Any legal comment, I can say, well, if that's true, and I didn't say it was true, by the way. If you listen to the pockets, they didn't say that's why he didn't testify. You can't suborn perjury, but you can let your client testify. Well, you have to not, but then I can't cross-examine him. You cannot cross-examine him. Right. But there's a mechanism. There is a mechanism that is probably worse than him not testifying, but yes. But basically, my comment is, well, of course, he wouldn't let him testify. It was because he didn't, he was not going to tell the truth. I didn't say, not tell the truth about what? People assume, but I didn't say it. People assume because it's the only relevant issue. Well, no, because there are a lot of things he could have said. He could have talked about either wife. He could have talked about where he was at a particular time. He could have talked about why he went to an outside locksmith. All of these things, if disclosed, would put in jeopardy the post-conviction petition proceeding. Right, but I didn't say which one. Does it matter? Let me ask this question. Here we are piecemealing through statements that you made during your podcast. I have to say allegedly because of the charge, but okay. WGN. Would you agree that when you read these, I feel bad about Peterson still not taking responsibility and Stacey still being missing. I'm thinking about maybe revealing what happened to Stacey and where she is. And then talk about closure. And then the statement you were just talking about when you explained him not testifying, you're recommending that he not testify. Would you just put all those together? Common sense. I never said that I did that. Okay, I'm saying when you put those together, don't you think the clear inference, what is clearly the listeners, lay people, is that he did it. They're somewhere and he's guilty of all of it. That's what you're hinting. You're trying to split that hair and say, but I didn't actually say it. But if you're out there making these statements, you may be tainting the jury pool just the same because they're assuming it because they should assume it based on these types of statements. Do you see that problem? Yes. I'm not going to say anything. You have to remember, though, two things. I am only safe, I'm only asked to talk about when he goes on national TV and says that he wasn't properly represented. Otherwise, so I guess that's like John 18, but he was without sin cast the first stone. I guess if his lawyers wouldn't let him talk, give extensive interviews in the media, nobody would care, nobody would call. So, you know, and also anybody, and as far as what I'm saying here, anybody who read the record and the transcripts could make the same comments. There's nothing that I have particular knowledge of. But there is potential. Well, that would be, if you told me X, Y, and Z, that would be. But I don't say that. You don't, but it's implicit in some of these statements that you may have knowledge. But he's been convicted. But that's not the point. But, well, they're saying because there's a post-conviction case pending that maybe in a 1 out of 10,000 chance you may get him to a new trial if it happens before he dies, which, you know, he's being 70 years old now and working with the cane and not in good health is probably very, very remote chance. You know, he's, that maybe it could influence something. Now, when I tried the case, we were worried about jury influence. We even tried to get the case moved or, you know, publicity influence on the case. And we were told that that could be, with instructions and good jury, my dear, that could be eliminated. Now, as long as I don't say, yeah, he confessed to me or something that is not, that is privileged, you know, a person who no longer has the, you know, has been convicted and affirmed on appeal. And I always said that I wouldn't use permission if I wanted to do that. I don't think that, you know, the cases certainly don't say that I could have my rights unless there's an imminent threat of serious harm to the judicial proceedings that is supported by evidence. Mr. Brodsky, I'm going to pause you only because you will have an opportunity to rebuttal. Let me just double-check. Justice Holder, any questions? All right, you'll have an opportunity to rebuttal, Mr. Brodsky. Thank you. Mr. Nicolosi. Thank you. Good morning again, Your Honors. May it please the Court, Mr. Brodsky. The State submits that this Court should affirm the trial court's finding below regarding the order entered on April 4th, 2023. Why is there a need for another gag order? I mean, it's duplicative. Why is this even happening? I have absolutely no idea, Your Honor. It was obviously in response to Mr. Brodsky's comments on the Banfield News Nation podcast shortly thereafter. I think it was Mr. Peterson's attorney who filed the petition for the contempt to hold Mr. Brodsky in direct criminal contempt. So it was in response to that. I can't argue with the underlying premise of your question, Your Honor. But what I will argue, as I argue in my brief, that while Mr. Brodsky says you can't have a blanket ban from talking about a particular case, I think this is a little different because this is a contempt case. It only deals with Mr. Brodsky's comments and threatened to make more comments. There aren't any more aspects to this particular proceeding than solely his comments on the Banfield News Nation podcast. So, again, if we're talking about serious and imminent threats and the court looking out for the fairness of a potential jury trial in the future, which he would have in this particular case. So we're worried about the integrity of the contempt trial? Yes. I think we could. Certainly. It's a thing. It could be a potential jury trial. The state was pursuing this as a serious indirect criminal contempt, which would carry the right to a jury trial down the road. And the state's looking out for the fairness of all the proceedings that are happening in court, including a potential jury trial in this contempt case. So this gag order precludes Mr. Brodsky from talking to anybody and saying, I think the fact that I've been charged with indirect criminal contempt is an example of the state's attorney's office picking on me because they don't like me. He actually cannot say that under this gag order. Would that be a fair interpretation of the scope of the gag order? I believe it would be, yes. I can't really argue. How can you defend that? I can't, really. Did you say can or cannot? Cannot. I can't defend that. As I would argue in my brief, I don't believe this issue is properly in front of this court. Which issue? What's that? Which issue? The issue of the 689 case itself. I believe this order, it was from April of 2024. Mr. Brodsky did not appeal it until after the December of 2024 hearing on the petition to dissolve. This should have been appealed a lot sooner. But if we accept, for the sake of analysis, that the denial of a request to dissolve a gag order gives us jurisdiction. But that was a petition to dissolve the gag order that Mr. Brodsky filed kind of out of thin air. Again, this order was entered in April of 2024. If he was obviously aware of this order, why wouldn't he have responsibility to appeal that at the time it was issued? Just assume for the sake of analysis that we think it was a timely appeal of the denial of his petition to dissolve. If I'm understanding you, you're conceding an issue with the scope of the gag order. I really have no good argument against it, Your Honor. Well, I appreciate that. Again, I would argue that the court had the ability to issue it. You might ask us to limit the scope, like perhaps they did in Brodsky 1. Sure, I think that's a perfect scope, yeah, in the original gag order. I don't really have anything else to say, I don't think, at this point, Your Honors. If there are any other questions, I'd be happy to answer them. But I don't really have, in light of this particular discussion with Justice Brennan, I don't really have much else to add. I have a question. We thank you for your time. Thank you. Mr. Brodsky, you have a rebuttal. I very much appreciate counsel's admission. I think that the gag order in place has no basis on statute and is not supported by the record, is not supported by any evidence, and is under, I think it's a people versus Trump, the D.C. appellate court case on constitutional grounds. It says the only thing you can do for a defendant is he can be prohibited from talking about witnesses in the case or court staff. Why that would be necessary here is beyond me because I don't think there's any evidence that if I said something, it would put any particular witness, we don't even know who they are, three and a half, three years, seven months into the case, or in my contempt case. But this, or, you know, more than any court status, would be threatened. And once again, we're hampered by a lack, by a complete lack of a record. And any evidence to support any type of restriction on the First Amendment, which is the right that I take. In the hearing, I think, I apologize, one second.  In the hearing on April 4th, the prosecutor gave a summary of the Banfield interview, which seemed to be a direct quote from the interview, at least that's the way it appears in the record. And why can't we consider that as evidence of what it was you were potentially going to say or didn't say in the Banfield podcast? Because it's not correct. Well, it may not be correct, but in the record, it appears to be correct. There's nothing to suggest otherwise. Yeah, well, and he then is the lawyer testifying. It's a proffer to the court. Yes. Right? And it's in support of a pretrial condition, which happens to be a gag order. And it wasn't disputed. Well, it's a pretrial condition of? It's a gag order. There's no question. Okay. But this was the proffer in support of. What did he say when he said that? Well, I'm not going to read it out loud in court. In general? No, it's just the thing where it's your discussion about what would happen if you let Mr. Peterson testify. I mean, my point is that there is evidence in the record as to the Banfield interview. We don't have the interview, but there's a summary of it by the prosecutor that's not disputed, at least at the time. And that would go to the 2022 court order, and that violates the attorney-file privilege. It might also go to propriety of a supplemental gag order, I suppose, or a duplicative gag order. I'm just asking. Look, this is the problem. It's so hard to know from all the comments and all the – I mean, I had a prosecutor sitting there on December 5th telling me that what I'm looking at in the record doesn't exist. It was something I had never experienced before. And then telling me I can't talk about my contempt case for my own good. I think that if there was a need for something supplemental to supplement the 2022 gag order to go beyond attorney-client privilege, then the motion should have been made, should have been evidence taken. And as they say, the narrowest possible restriction in both – it wasn't done. These are – remember, this is not a minor procedural thing. This is the First Amendment right that I think I put in the brief that for reasons – my traveling when I was young, it's a right that I understand how unique it is to America. I don't think most Americans do. But when you travel extensively, and especially when I've been in Eastern Black countries, totalitarian and authoritarian regimes, the right to – you're going to begin to appreciate how precious that is and how unique it is. And I don't think it's anything that should be toyed with like that as appears to me to be taking place here. I think it's something that the state should – and this state, in any case, and any state and union should be protecting and not trying to toy with saying, well, if you say this, maybe this. And maybe you'll be incarcerated. Maybe you won't. How do I define it? Well, we'll leave that up to the jury. And what did I say? Well, we've got 20 minutes. You figure it out. This is not the way to treat the First Amendment. And I don't think the cases say that either. They are very specific. They have to be narrow. You have to have specific findings based on evidence to support that the findings that there's going to be an imminent threat, a serious threat that's going to take place, and it's going to be a threat to the adjudication process. And that hasn't ever been done. If it did – And if you could sum up, Mr. Brasco. Yes, I'm sorry. This is, I believe, as you can tell, probably a matter that – No, I think you described the state position of the jury as Kafka-esque, which I think – That's it. When you read the – I don't know. Maybe I'm wrong because I'm obviously biased. But when you read that December 5th transcript and look at the record, I don't know how you can come to any other conclusion. But perhaps I'm wrong and I'm not being kind enough. And I do want to apologize. You know, I did put a comment in my brief out of frustration about jealousy on page 16, and I withdraw it. It was a result of the frustration of reading that December 5th order again, and I apologize if it insulted anybody. But this is an emotional – an important issue for me for those reasons. I take that vengeance as not just a mere inconvenience. It's much, much more. All right. Thank you very much. The court thanks both sides for spirited argument. We will take the matter under advisement and issue a decision in due course.